UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

VINCENT HUNTER,

    Petitioner,

   - against -          02 Civ. 3476 (RJH)

JOHN SABOURNE,         **MEMORANDUM**
                  **OPINION AND ORDER**

    Respondent.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

   Vincent Hunter brings this § 2254 habeas petition on the ground that his conviction pursuant to Section 220.44 of New York's Penal Law was secured in violation of the Sixth Amendment. On June 25, 2004, the Hon. Theodore H. Katz, United States Magistrate Judge for the Southern District of New York, issued a Report and Recommendation (the "Report) recommending that the petition be denied; shortly thereafter, petitioner filed timely objections. Having considered these materials, the Court finds that the petition does not meet the threshold for habeas relief because, as explained more fully below, the First Department of New York's Appellate Division did not "unreasonabl[y] appl[y] . . . clearly established Federal law, as determined by the Supreme Court," in upholding petitioner's conviction. 28 U.S.C. § 2254(d)(1). Accordingly, the Court adopts the Report and denies the petition.

**BACKGROUND**

Except where noted, the following facts were established at trial (citations to the transcript are designated "Tr."). On September 22, 1996 at approximately 8:40 p.m. petitioner and a second individual, Timothy Johnson, were arrested near 183rd Street and Walton Avenue in the Bronx in connection with a "buy and bust" operation conducted by the New York City Police Department. During the operation, an undercover officer, Detective Nunez, approached Johnson and inquired about a "brand" of heroin known as "Black Sunday." Johnson responded that Black Sunday heroin was unavailable, and referred Detective Nunez to petitioner, who sold him a glassine of "OD" branded heroin. Detective Nunez made the purchase with $10.00 of prerecorded buy money, and then radioed a description of Johnson and petitioner to the arrest team. After Nunez positively identified both men, they were arrested by Detective Rhaese. Although no contraband was found on petitioner, he was charged with criminal sale of a controlled substance in or near school grounds in violation of Section 220.44 of New York's Penal Law.[1]

Petitioner's trial commenced on May 4, 1998 in the New York State Supreme Court, Bronx County, where he was represented by a staff attorney for the Criminal Defense Division of the Bronx County Legal Aid Society ("Bronx Legal Aid"). At some point during trial – it is unclear exactly when – petitioner's trial counsel learned that another individual, Alan Mohammed, had also been arrested on September 22, 1996, at about the same time, and in close proximity to the site of petitioner's arrest.[2] In addition,

---

[1] At the time of the arrest, a quantity of marijuana and the prerecorded buy money were recovered from Johnson, who was charged and tried separately as a minor.

[2] Mohammed was arrested at 54 East 183rd Street. Although it is unclear from the trial record exactly how close the corner of 183rd and Walton Street is to 54 East 183rd, there was testimony that the latter address is associated with a building "in the middle of the block," as measured from the corner of 183rd and Walton, where petitioner was arrested. (Tr., p. 451). And petitioner's trial counsel opined that 54 East 183rd was

2

petitioner's trial counsel discovered (i) that Mohammed and petitioner were dressed similarly at the time of the arrests;[3] (ii) that Mohammed was arrested for selling marijuana;[4] and (iii) that Mohammed, like petitioner, was represented by Bronx Legal Aid in connection with his arrest.

This latter fact is reflected in the record, which shows that an attorney from Bronx Legal Aid represented Mohammed during a plea hearing on December 2, 1996 relating to the marijuana charge. After pleading guilty to a lesser offense (disorderly conduct) Mohammed failed to comply with the conditions of his sentence, which included a $25 fine. For that reason, on February 3, 1997 a bench warrant was issued for his arrest. (Pet. Reply, p. 4). There is no evidence that Mohammed appeared at any subsequent court proceeding in connection with his September 22, 1996 arrest, or that he had *any* contact with Bronx Legal Aid after his December 2, 1996 plea hearing. (*Id.*) Neither is there any indication that *petitioner's* Legal Aid attorney in 1998 had any involvement with the December 2, 1996 hearing, either directly or through access to Mohammed's file.

Anticipating a possible defense of mistaken identity, the State requested permission to introduce a picture of Mohammed at the close of petitioner's trial.

---

"exactly five doors down" from the corner. (Tr., p. 511). By either account, the arrest locations were near each other.

[3] Mohammed was described as a black male of medium build, wearing a black "kangol" hat, blue jeans and a blue jacket, (Tr., p. 454); petitioner was described similarly, as a black male of medium build wearing a white T-shirt, blue jeans, a blue or black cap, and possibly a blue or black jacket. (Tr., pp. 218, 406, 444-445, 460, 462, 470, 475). In addition, both men were in their mid to late thirties at the time of arrest. (Tr., pp. 457, 461).

[4] Petitioner alleges that this particular fact is important because Johnson, who was arrested alongside petitioner on September 22, 1996, was found to have a quantity of marijuana at the time of his arrest. On this basis, petitioner suggests that Johnson may have purchased some marijuana from Mohammed – who, as noted, was arrested for selling marijuana – and been given pre-recorded buy money as change. According to petitioner, that would explain why Johnson was found with marijuana and pre-recorded buy money, but petitioner was found with nothing. (Tr., p. 508).

Petitioner's counsel immediately requested a sidebar to discuss the issue, during which she accused the prosecution of failing to turn over Brady material regarding Mohammed and objected to introduction of the picture. (Tr., pp. 489-90). After hearing argument from both parties, the court ruled that there was no Brady violation, explaining that Mohammed's arrest "happened at a different location" and was for a "different crime," and also opining that the descriptions of the two men were different, notwithstanding the fact that they were wearing similar clothing. (Tr., p. 490).[5] At the same time, the court indicated that petitioner's counsel was free to argue mistaken identity to the jury if she was so inclined. (Tr., p. 490). Petitioner's counsel declined the invitation, stating that she had already prepared her summation and did not intend to make a mistaken identity argument. (Tr., pp. 494-94). On this basis, the court ruled that the picture was irrelevant, although petitioner's counsel was allowed to see it. (Tr., pp. 495, 497, 501-02). The court then adjourned trial until the following Monday.

As soon as trial commenced on Monday morning petitioner's counsel moved for a mistrial, and the following colloquy ensued:

DEFENSE
COUNSEL:
>Subsequent to picking a jury, I learned that Allen Mohammed was and is a Legal Aid client on the very matter for which he was arrested on September 22nd, 1996. . . I believe the testimony was that . . . Mohammed was wearing blue jeans, a white shirt and Kango cap, [and] a blue jacket. I further believe that . . . [Mohammed] is a male black with medium build. [On Friday, the court] asked me whether or not I had intended to argue to the jury that Allen Mohammed was the true seller and I [said] . . . that . . . I would not do so. Upon reflection, over the weekend, . . . it became clear to me that there was a conflict. Even if I wanted to argu[e] to this jury that Allen Mohammed was the true seller and [that the police] confused the two . . . I could not do so.

---

[5] The judge noted in this regard that he "d[id] not know how many people in Bronx County . . . have blue jeans and white shirts," but suggested that the figure was high. (Tr., p. 490).

4

THE COURT: Why could you not do so?

DEFENSE COUNSEL: Because he is a Legal Aid client. We cannot play one client off the other. I am not permitted to accuse Allen Mohammed of doing anything when he is a Legal Aid client, nor . . . could I send an investigator to go and interview Allen Mohammed to inquire of him as to the events surrounding the arrest of [petitioner]. . . . I cannot argue to this jury that Allen Mohammed was the seller [of heroin], that he sold [marijuana] to [Johnson] or gave [Johnson] the [pre-recorded buy money he was found with].[6]

THE COURT: Allen Mohammed was arrested . . . for a different charge, selling marijuana . . . at another location and as a result of a transaction with a different undercover. It is true that [both men were arrested by Detective Raehse] and that [both men were arrested at] roughly the same time. . . . Now, to argue to this jury that they got the two people confused, is rather farfetched. . . . But I will not underestimate the naivety of a Bronx jury. If you want to do it, do it, but I don't see how you are violating any kind of ethical considerations by saying that they made a mistake with respect to your client here. . . . And you are certainly not filing any charges against Allen Mohammed . . . and to say there is something unethical about the fact that they have confused Allen Mohammed with your client . . . [with respect to] the attorney/client relationship between you and Allen Mohammed is certainly stretching the imagination. I don't see a problem.

(Tr., pp. 504-511).

Immediately after this exchange the court denied the application for a mistrial, and the parties proceeded to give closing statements. Notwithstanding the foregoing colloquy, and after having successfully objected to the admission of Mohammed's picture, petitioner's counsel relied heavily on the similarities between petitioner and Mohammed during her summation:

[O]n the people's direct case [the arresting officer] never even mentioned to you that there was another individual with blue jeans [and a] white shirt. . . . [This second person] was also arrested at 8:40 . . . in the same general location but [the arresting office] has a problem with this because if [he] is holding [petitioner] at 183rd and Walton [he] can't also be half a block up

---

[6] *See* footnote 4, *supra*.

5

> arresting . . . Mohammed. . . . I submit to you that he left out the information about [Mohammed] deliberately. . . . He knew all about it [but] didn't volunteer it on his direct case. I asked him did you line-up . . . Mohammed next to [petitioner]? [He said] [n]o. Did you show . . . Mohammed to [the undercover office who identified petitioner]? [He said] [n]o. [I asked whether he] [s]earch[ed] anyone else . . . for that kind of description? [He said] [n]o. Because in 15 minutes an awful lot of people can be wearing blue jeans. . . .
>
> [A]sk to be read back some of the testimony. According to [the arresting officer's] reports, [petitioner] is wearing a black jacket and black hat. . . . And [the identifying officer] never mentioned anything about a jacket. . . . I'm not here to tell you that . . . Mohammed was the seller and they confused the two. . . . I'm not going to point the finger at . . . [Mohammed] like [they are doing] to [petitioner]. . . . But the fact of the matter is [the arresting officer] says no one else matches that description and that wasn't entirely true. There was another person matching the description. Maybe they did confuse the two. I don't know. I wasn't there. But I'm not prepared based on the evidence that we have here to say [that] . . . Mohammed is the seller. But if you say to yourself that he could have been, then you have a reasonable doubt, or could have been other people as well.

(Tr., pp. 547-549). This line of argument plainly contradicted defense counsel's earlier statements, and the basis on which she moved for a mistrial, namely, that she could not argue mistaken identity because she was "not permitted to accuse Allen Mohammed of doing anything when he is a Legal Aid client. . . ." (Tr., p. 507).

The jury returned its verdict that same day, May 11, 1998, and found petitioner guilty. Petitioner appealed his conviction to the Appellate Division, First Department, arguing that his trial counsel was forced to proceed under a conflict of interest, and claiming that he was therefore denied effective assistance of counsel in violation of the Sixth Amendment. The First Department rejected this claim, holding that the trial court "properly denied defendant's motion for a mistrial and appointment of new counsel" because there was "no conflict of interest," *People v. Hunter*, 283 A.D.2d 248, 248 (1st Dep't 2001), and also because even if a conflict existed, petitioner did not "establish[]

6

that the conflict adversely affected his attorney's performance." *Id*. (citing *Cuyler v. Sullivan*, 446 U.S. 335 (1980)). In support of this latter point, the Appellate Division observed that the "record establishes that notwithstanding the claimed conflict, counsel pursued a line of defense concerning [Mohammed]," albeit a line of defense the court considered "far-fetched . . . given the evidence." *Id*. Petitioner's application for leave to appeal his ineffective assistance claim to the New York Court of Appeals was denied on August 31, 2001. *People v. Hunter*, 96 N.Y.2d 919 (2001).

On May 6, 2002, the instant petition was filed, and on June 25, 2004, Magistrate Judge Katz recommended that it be denied. Petitioner filed timely objections to that recommendation, to which the Court now turns.

## **STANDARD OF REVIEW**

A district court may designate a magistrate to hear and determine certain motions and to submit to the court proposed findings of fact and a recommendation as to the disposition of the motion. *See* 28 U.S.C. § 636(b)(1). Within ten (10) days of service of the recommendation, any party may file written objections to the magistrate's report. *Id.* Upon review of those portions of the record to which objections were made, the district court judge may "accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1)(C).

The nature and depth of that review depends on the tenor and specificity of the objections. Where objections are "merely perfunctory responses," argued in an attempt to "engage the district court in a rehashing of the same arguments set forth in the original petition," reviewing courts should review a report and recommendation for clear error. *Vega v. Artuz*, 2002 WL 31174466, at *1 (S.D.N.Y. 2002); *see also Barratt v. Joie*, 2002 WL 335014, at * 1 (S.D.N.Y. Mar. 4, 2002) ("When a party makes only conclusory or

7

general objections, or simply reiterates his original arguments, the Court reviews the Report and Recommendation only for clear error.") (citation omitted). On the other hand, where objections to a report are "specific and . . . address only those portions of the proposed findings to which the party objects," district courts should conduct a *de novo* review of the issues raised by the objections. *Camardo v. Gen. Motors Hourly-Rate Employees Pension Plan,* 806 F.Supp. 380, 381-82 (W.D.N.Y. 1992).

Petitioner has objected to the Report in its entirety. Given the specific nature of these objections, the Court will review the Report *de novo* rather than for clear error.

## **DISCUSSION**

Under Section 2254(d) of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), a district court's ability to grant a habeas petition is strictly limited where the claim was previously adjudicated on the merits by a state court. In this case, there is no question that the claims raised in the petition were adjudicated on the merits. The Bronx County Supreme Court squarely rejected the proposition that petitioner's trial counsel was operating under a conflict, explaining that she was free to argue that the police had mistaken petitioner for Mohammed. (Tr., p. 510). As noted, the Appellate Division also rejected the claim, finding that there was "no conflict of interest" and noting that in any case petitioner's attorney pursued the mistaken identity defense that was allegedly precluded by the conflict, this despite the fact that the theory was "far-fetched." 283 A.D.2d 248, 248. Ultimately, the New York Court of Appeals denied petitioner leave to appeal, which means that the decision of the Appellate Division constitutes an "adjudication on the merits" in this case. *Cotto v. Herbert,* 331 F.3d 217, 231 (2nd Cir. 2003) (where leave is denied by Court of Appeals, Appellate Division ruling is an "adjudication on the merits").

In rejecting petitioner's Sixth Amendment claim, the Appellate Division addressed a mixed question of law and fact. *Strickland v. Washington*, 466 U.S. 668, 698 (1984) (whether conflict of interest exists is a mixed question of law and fact). Under AEDPA, mixed questions of law and fact are reviewed pursuant to 28 U.S.C. § 2254(d)(1), which provides that:

> [a]n application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted . . . unless the adjudication of the claim . . . resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States.

28 U.S.C. § 2254(d)(1); *Williams v. Taylor*, 529 U.S. 362, 404-05 (2000); *Overton v. Newton,* 295 F.3d 270, 277 (2d Cir. 2002).

In this case, petitioner contends that a writ is appropriate because the judgment of the Appellate Division involved an "unreasonable application of" Supreme Court precedent. 28 U.S.C. § 2254(d)(1).[7] Several well-established legal principles will govern this claim. First, the phrase "clearly established Federal Law, as determined by the Supreme Court" limits the law governing a habeas claim to holdings – as opposed to dicta – of the Supreme Court "as of the date of the relevant state court decision." *Gilchrist v. O'Keefe,* 260 F.3d 87, 93 (2d Cir. 2001). Second, an "unreasonable application" of clearly established Supreme Court precedent occurs only if a state court either (i) "identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case,"

---

[7] The Appellate Division's holding was plainly not "contrary to" clearly established Federal law because petitioner does not – and indeed, cannot – show that "the state court arrive[d] at a conclusion opposite to that reached by [the Supreme] Court on a question of law or [that] the state court decide[d] a case differently that [the Supreme] Court has on a set of materially indistinguishable facts." *Williams*, 529 U.S. 362, at 412-13. Indeed, there are simply no "materially indistinguishable" Supreme Court cases, a fact petitioner essentially admits in his objections to the Report. (Obj., p. 4) ("None of the cases cited in the [Report] . . . have considered the undisputed facts that arise in this case.").

*Williams*, 529 U.S. at 413, or (ii) fails to extend a principle of clearly established law "to situations which that principle should have, in reason, governed." *Kennaugh v. Miller*, 289 F.3d 36, 45 (2d Cir. 2002). In either case, in order to qualify as an "unreasonable application," the state court's application must be "objectively unreasonable," such that a petitioner "must identify some increment of incorrectness beyond [mere] error in order to obtain habeas relief." *Cotto*, 331 F.3d 217, at 248.

With these principles in mind, the Court turns to the merits of the petition, which focuses on the reasonableness of the Appellate Division's application of *Holloway v. Arkansas*, 35 U.S. 475 (1978) and *Cuyler v. Sullivan*, 446 U.S. 335 (1980) to the facts in petitioner's case, as informed by the Sixth Amendment's guarantee that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defense," U.S. Const. Amend. VI, and the "correlative right to representation that is free from conflicts of interest." *Wood v. Georgia*, 450 U.S. 261, 271 (1981). The precise issue, of course, is whether the Appellate Division "unreasonably applied" either *Holloway* or *Sullivan* (or any other "clearly established Federal Law") in upholding petitioner's conviction. 28 U.S.C. § 2254(d)(1).

The Report answered that question in the negative for two reasons: first, because once notified of the potential conflict in petitioner's case, the trial court conducted an inquiry, as it must under *Holloway*; and second, because petitioner's trial counsel incorrectly "perceived herself to be operating under a conflict of interest," (Report, p. 14), which is not enough under *Tueros v. Greiner*, 242 F.3d 587, 590 (2d Cir. 2003), or

any Supreme Court precedent, including *Sullivan*, to conclude that an actual conflict existed.[8]  For the following reasons, the Court agrees.

### A.  The *Holloway* Inquiry

Petitioner first objects to the Report on the ground that the trial court did not make "any sort of meaningful inquiry" into the conflict issue, instead "simply rul[ing] that no conflict existed."  (Obj., pp. 9-11).  Indeed, according to petitioner, the trial court conducted "no inquiry whatsoever" into the conflict issue, as evidenced by the fact that not a "single question . . . [was] asked of counsel."  (Obj., p. 10).  Petitioner contends that this failure to inquire amounted to an unreasonable application of *Holloway v. Arkansas*, 35 U.S. 475 (1978), which, if true, means that his petition must be granted pursuant to § 2254(d)(1).

In *Holloway*, the Supreme Court held that reversal is mandatory where defense counsel is forced to represent codefendants over a timely objection that a conflict of interest exists, unless trial court makes an independent determination that there is no conflict.  Thus, under *Holloway* and subsequent Supreme Court holdings, when a trial court is alerted to the possibility of a conflict of interest, it has a "threshold obligation to determine whether the attorney has an actual conflict, a potential conflict, or no conflict." *United States v. Kliti,* 156 F.3d 150, 153 (2d Cir. 1998); *Cuyler v. Sullivan,* 446 U.S. 335, 346 (1980) ("Holloway requires state trial courts to investigate timely objections to multiple representation").  This initial obligation to inquire arises whenever a trial court is

---

[8]  In the Report, Judge Katz also addressed the applicability of *Strickland v. Washington*, 466 U.S. 668, 690-694 (1984) (the Sixth Amendment is violated if the defendant can show both that counsel was ineffective and that prejudice resulted) to petitioner's conflict claim, finding that any *Strickland* ineffective assistance argument to be procedurally defaulted.  In his objections to the Report petitioner indicates that he is not claiming ineffective assistance under *Strickland* because such an argument "is not appropriately raised" where, as in this case, the alleged Sixth Amendment violation is based on an alleged attorney conflict of interest.  (Objections, p. 7 n. 2).  The Court agrees and therefore declines to address the *Strickland* issue.

11

"sufficiently apprised of even the possibility of a conflict of interest" *United States v. Levy,* 25 F.3d 146, 153 (2d Cir. 1994). Where a possible conflict has been "entirely ignored" by the district court, reversal is "automatic." *Id.*

Relying on these principles, petitioner contends that the Appellate Division unreasonably applied *Holloway*. For several reasons, the Court disagrees. First, unlike the trial court in *Holloway*, petitioner's trial court did not "cut off any opportunity of defense counsel to do more than make conclusory representations"; nor did the court fail to inquire into the source of the purported conflict. *Holloway*, 35 U.S. at 484 n.7. To the contrary, as set forth above, the court engaged petitioner's counsel in an extensive exchange on the subject, made inquiries, and allowed her to fully explain her position. (Tr., pp. 504-511). That the trial court ultimately disagreed with counsel's appraisal of the situation, ruling that she was free to argue that the police confused her client with Mohammed, certainly does not mean that the Appellate Division unreasonably applied *Holloway*. It is the hearing – not the outcome – that matters, at least at this stage of the analysis.

Second, although by no means extensive, the nature and scope of the inquiry undertaken by petitioner's trial court was proportionate to the alleged conflict. In *Holloway*, by contrast, the purported conflict was potentially grave – a single public defender represented three codefendants in the same trial – and the inquiry was cursory (at best). After learning that all three defendants planned to testify in their own defense, the public defender brought the potential conflict to the trial court's attention, noting that it would be difficult to question any of the three defendants without compromising his obligations to the others, or to the testifying defendant himself. 35 U.S. at 478-79. Having been put on notice of this potential conflict *before* trial began, the court

summarily concluded that there was no conflict of interest, and otherwise prevented Holloway's counsel from adequately explaining his position. *Id.*, at 484 n.7.

In petitioner's case, by contrast, despite the fact that his counsel raised the conflict issue late in the trial, the court invited her to explain her position, explicitly asking why she felt she could not argue that the police confused Mohammed with her client. (Tr., p. 507). That inquiry, at that stage of the case, was simply not an "unreasonable application" of *Holloway* or any other Supreme Court precedent. Indeed, as long as the inquiring court "take[s] adequate steps to ascertain whether" the risk of conflict is "too remote," or "warrants separate counsel," 35 U.S. 484, the conflict inquiry need not take any particular form, or be undertaken at any specific length. Thus, where, as here, the alleged conflict is judged by the trial court to be speculative, there simply is no "clearly established Federal Law" that would require the court to undertake a more extensive inquiry than was conducted in petitioner's case, which means that relief is unavailable under 28 U.S.C. § 2254(d)(1).

### B. *Sullivan* and the Alleged Actual Conflict

Petitioner also objects to the Report on the ground that it incorrectly concludes "that the conflict [at issue in this case] was not a real conflict, but only a subjective belief on the part of counsel that she was laboring under a conflict." (Obj., p. 3). There is no dispute that petitioner's trial counsel *subjectively* believed that she was operating under a conflict when she moved for a mistrial, which is clearly not enough to trigger habeas relief under the Second Circuit's decision in *Tueros v. Greiner*. Recognizing this, petitioner now argues that his counsel was forced to proceed at trial under an *objective*, "actual conflict" of interest that adversely affected her performance. For this reason,

13

petitioner argues that the Appellate Division unreasonably applied *Cuyler v. Sullivan*, 446 U.S. 335 (1980) in upholding his conviction.[9]

Before addressing the merits of that claim, a point of clarification is in order. Both the Report and petitioner's objections rely upon and attempt to distinguish a series of federal district court cases dealing with purported conflicts within large law firms and defender organizations. S*ee, e.g., United States v. Reynoso*, 6 F. Supp. 2d 269 (S.D.N.Y. 1998) (denying government's motion to disqualify defense attorney with Legal Aid's Federal Defender division where the Federal Defender previously represented one of the government's witnesses in the case); *United States v. Lech*, 859 F. Supp. 586 (S.D.N.Y. 1995) (Federal Defender attorney not automatically disqualified where a different attorney from the same office previously represented a qualifying witness, as long as the office erected a "Chinese Wall" between the two attorneys). Both also discuss Second Circuit cases, as well as a New York Court of Appeals case. *See, e.g., Tueros,* 343 F.3d 587 (subjective but mistaken belief that a conflict exits does not amount to Sixth Amendment violation); *United States v. Oberoi*, 331 F.3d 44 (2d Cir. 2003) (abuse of discretion to force attorney to proceed where representation would violate the Code of Professional Responsibility, such as where representation would likely force attorney to cross examine former client using client confidences); *People v. Wilkins*, 28 N.Y.2d 53 (1970). To be sure, the question that prompted this careful research, whether and under

---

[9] Petitioner also argues that the Appellate Division unreasonably applied the Supreme Court's holding in *Mickens v. Taylor*, 535 U.S. 162 (2002). Because *Mickens* was decided after the Appellate Division's ruling, *People v. Hunter*, 283 A.D.2d 248, 248 (1st Dep't May 15, 2001), the Court will not test the ruling against *Mickens. Tueros*, 343 F.3d at 593-94 (2d Cir. 2003) ("the command of § 2254(d) indicates that [reviewing courts] are only able to consider the holdings of Supreme Court cases decided at the time of the state court conviction" (emphasis removed)).

14

what circumstances attorney conflicts can be imputed across large public defender organizations, is a vexing one.

But none of the above-cited cases is dispositive of the issue raised by this petition, which, as noted at the outset, is <u>strictly</u> limited by AEDPA. *Tueros*, at 591-92 ("only the holdings of the Supreme Court . . . may comprise Federal Law" for purposes of AEDPA). As the Second Circuit explained in *Tueros*:

> Despite the importance of the definition of an "actual conflict," which if demonstrated permits a defendant to bring his case within the ambit of *Sullivan*, our role as reviewer . . . [of the] habeas petition is limited and does not entail stating our opinion as to the proper division between the cases in which *Strickland* and *Sullivan* should apply. Under our congressionally circumscribed authority established in 2254(d)(1), we address the issue only tangentially and hold that it was neither contrary to, nor an unreasonable application of, clearly established Supreme Court precedent to conclude that Tueros' counsel did not have an "actual conflict" of interest as defined in *Sullivan*.

*Tueros*, 343 F.3d 587 at 592. This Court must similarly limit its consideration of the alleged conflict in this case, such that the only question it may ask is whether the Appellate Division's decision upholding petitioner's conviction involved an unreasonable application of <u>Supreme Court</u> precedent. 28 U.S.C. § 2254(d)(1). The Court now turns to that question.

The starting point for any attorney conflict inquiry is *Cuyler v. Sullivan*, 446 U.S. 335 (1980). The petitioner in *Sullivan* brought a Sixth Amendment conflict claim where he was represented at trial by two privately retained attorneys who also represented two of his alleged accomplices in separate trials. 446 U.S. at 337. Sullivan was convicted after a trial during which he did not testify; his alleged accomplices were acquitted in separate trials. After finding that both attorneys jointly represented all three defendants the Supreme Court held that "multiple representation" violates a defendant's Sixth

15

Amendment rights only if the petitioner can "establish that an actual conflict of interest adversely affected his lawyer's performance." *Id.*, at 350. The Court then remanded the case with instructions to consider whether an actual conflict adversely affected Sullivan's attorneys' performance. *Id*.

As noted, *supra*, petitioner now claims that his attorney labored under an actual conflict that adversely affected her performance at trial, and therefore argues that in upholding his conviction the Appellate Division unreasonably applied *Sullivan*. 28 U.S.C. §2254(d)(1). An "unreasonable application" of Federal law occurs when a state court "identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case," *Williams*, 529 U.S. 362, at 413, or if it fails to extend a principle of clearly established law "to situations which that principle should have, in reason, governed." *Kennaugh v. Miller*, 289 F.3d 36, 45 (2d Cir. 2002). Petitioner cannot meet this standard. Neither *Sullivan* nor any other Supreme Court case stands for the proposition that an actual conflict adversely affecting an attorney's performance arises where a client of a large defender organization – call him "Client A" – is the subject of a mistaken identity defense in the prosecution of another client – call him "Client B" – especially where, as here (i) Client A and Client B were represented by different attorneys within the organization, and there is no other indication that the confidential information of either client is at risk of being compromised; (ii) the representation of Client A was for a crime (in this case, the sale of marijuana) that was unrelated to the crime with which Client B was charged (in this case, the sale of heroin); (iii) the organization's last contact with Client A occurred approximately a year and a half before Client B's trial, thus calling into question the proposition that the organization's representation of Client A was ongoing;

(iv) there is absolutely no evidence that Client B's trial counsel intended to subpoena Client A to testify, even if he could be located, and counsel objected to the introduction of a picture of Client A; and, finally (v) the trial court actually permitted counsel for Client B to argue mistaken identity to the jury, which she did.

Although the Supreme Court has ruled on the question of attorney conflicts on several occasions, in each case it has done so where attorneys were forced to represent *codefendants* who allegedly participated in a common criminal undertaking. *See Glasser v. United States*, 315 U.S. 60, 70-71 (1942) (conflict exists where one defense attorney is forced to represent codefendants at the same trial over the objections of the attorney); *Holloway*, 435 U.S. 475 (1978) (reversal is automatic where defense counsel is forced to represent codefendants at the same time over a timely objection that a conflict of interest exists, unless trial court makes independent determination that there is no conflict); *Sullivan*, 446 U.S. 335 (1980) (actual conflict where petitioner was represented at trial by two attorneys who also represented two of his alleged accomplices in separate trials). The present case cannot be said to be an unreasonable application of these decisions, which means that relief under 28 U.S.C. § 2254(d)(1) is unavailable.

Finally, although the Second Circuit in *Tueros* suggested that "it may well be unreasonable not to extend *Sullivan's* definition of an 'actual conflict' to a lawyer whose conflict was defined by representing divergent interests of a defendant and an important subpoenaed witness," 343 F.3d at 594, this Court concludes that it is *not* unreasonable to decline to extend *Sullivan's* definition where there is no evidence – aside from pure speculation – that the purported witness was either "important" or "subpoenaed"; where the alleged "multiple representation" is separated by more than a year and only arises by imputing an attorney/client relationship across a large public defender organization; and,

finally, where counsel actually presented the defense she claimed she was ethically precluded from making.

## **CONCLUSION**

For the foregoing reasons, the petition is denied. The Clerk of the Court shall close this case.

SO ORDERED.

Dated: New York, New York
October 20, 2005

Richard J. Holwell
United States District Judge